UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARY JO POPE and JAMES M. POPE,

       Plaintiffs,

  v.                   Case No. 8:14-cv-891-T-33AEP

ANY SEASON INSULATION, LLC,

       Defendant.

_____/

### ORDER

This cause comes before the Court pursuant to Defendant Any Season Insulation, LLC d/b/a Bayside Installed Building Products' (Any Season) Motion for Summary Judgment and Incorporated Memorandum of Law in Support Thereof (Doc. # 48), filed on February 9, 2015. Plaintiffs Mary Jo Pope and James M. Pope filed a response in opposition to the Motion on March 11, 2015. (Doc. # 56). Any Season filed a reply thereto on March 25, 2015. (Doc. # 59). The Court conducted oral argument on May 11, 2015. (Doc. # 62). For the reasons that follow, the Motion is granted.

### I.  Background

Any Season[1] "primarily installs insulation in homes throughout the greater Tampa Bay area." (Doc. # 48-1 at ¶ 4). Although Any Season is its own legal entity, it is affiliated with Installed Building Products, LLC. (Id.). "While [Installed Building Products'] insulation companies are separate companies, they may draw upon resources, including Human Resources, from [Installed Building Products'] Columbus, Ohio office." (Id. at ¶ 5). Mr. Pope was the regional manager of Bayside and, as such, he was responsible for all branch operations, including hiring, firing, and sales. (Doc. # 48-2 at 4). Mrs. Pope served as the office administrator, responsible for "job-costing," invoicing, collections, payroll, filing, and benefits. (Doc. # 48-3 at 10).

Due to Any Season's poor financial performance and "[i]n a last effort to save the company," the company "charged [David] Vella with assessing Any Season and attempting to turn it around." (Doc. # 48-1 at ¶¶ 9-10). On October 10, 2012, Mr. Vella took the Popes out to lunch "in order to get to know them on a personal level and to discuss [his] thoughts

---

[1]    Although Defendant refers to itself as "Any Season," the name of the company where Plaintiffs worked is "Bayside Installed Building Products" (Bayside). (See Doc. # 48).

on the current state of the branch and how things could be improved." (Doc. # 48-4 at ¶ 3). During that lunch, Mr. Vella "met a young man named Chris Carter, who [he] invited to join [Mr. Vella and the Popes] for lunch. [They] discussed employment opportunities at the branch, and [Mr. Vella] invited [Mr. Carter] to apply for a job, which he later did. Mr. Carter began working at Bayside as a gutter installer on November 1, 2012." (Id. at ¶ 5).

On the evening of October 10, 2012, "out of the blue [Mr. Vella] said 'So how are the prostitutes in this neighborhood?'" (Doc. # 48-3 at 22). Mrs. Pope was "flabbergasted" and said "disgusting." (Id.). Mr. Vella responded that Mrs. Pope was "not looking at the right websites." (Id.). Mrs. Pope indicated that she does not "agree with that lifestyle," to which Mr. Vella responded that "men have needs" and "there's no one woman that can satisfy one man. If you think you can satisfy your man alone, not going to happen. Men have needs. They need prostitutes. Should be legal." (Id.). Again, Mrs. Pope said she "disagreed." (Id.). Mr. Vella also told Mrs. Pope that she could not "satisfy" her husband. (Id. at 28).

On October 11, 2012, Mr. Vella arrived at Bayside around 9:00 AM. (Id. at 30). Upon his arrival, Mr. Vella told several

3

individuals about what had occurred that morning when he was waiting in a car for a real estate agent: "You're never going to believe what happened to me . . . I'm sitting there, with my window down, my arm sitting there, and a prostitute walked over, pulled up her shirt, flipped her boobs on my arms and laid them there. . . ." (Id. at 30–31). Mr. Vella then asked the woman, "What's it going for these days? And she goes $48." (Id. at 31).

Mr. Vella similarly "told [several individuals] about going to a gentlemen's club the night before." (Id. at 31–32). Mrs. Pope recalls, "[Mr. Vella] told us that he had met a really cute girl there, that she had been texting him all night, that she was 23 . . . that she had been a nanny, and that he would like to hire her here." (Id.). Later that day, Mr. Vella told Bayside employees that "[w]e're going to hire another girl for this office, a young one and pretty one too." (Doc. # 56-1 at ¶ 13).

Thereafter, Mr. Vella told Mrs. Pope "I see you out of this office, I see you in sales." (Doc. # 48-3 at 32). However, Mr. Vella told Mrs. Pope that a position in sales is "not a job for a woman." (Doc. 56-1 at ¶ 21). Mrs. Pope remembers Mr. Vella explaining:

> You have a fight with your husband. You go to a job
> site. You meet a super. He takes you to lunch. Then
> it leads to dinner and a bottle of wine. And then
> he explained how he had had affairs, numerous
> affairs, and he knows how affairs work. And that's
> when he hugged himself like this and said, "If you
> were my girl, I'd keep you right here."

(Doc. # 48-3 at 33). In her affidavit, Mrs. Pope submits that she responded to Mr. Vella's remarks as follows: "I told Mr. Vella that I had dealt with men all my life and that my being a female would not be an issue. Mr. Vella, however, disagreed and shut down any future conversations I attempted to have with him about my desire for the promotion." (Doc. # 56-1 at ¶ 22).

That same day, Mr. Vella told one of the installers: "I want you to know where that dipstick is like you know where your wee wee is when you go pee pee." (Id. at 34). Later on, Mrs. Pope suggested the production manager, Howard Maynard, get a massage because he had been in an accident. Mrs. Pope alleges that Mr. Vella, who was also present, stated "Quit thinking about it Howard . . . I've been thinking about it for 48 hours. It's (Mrs. Pope giving Mr. Maynard a massage) not going to happen." (Id. at 35). Mr. Vella further made comments suggesting that he "wanted [Mrs. Pope] outside of the office." (Id. at 7-8).

5

In addition, "Mr. Vella made it very clear to [Mrs. Pope] and to others that he always carried a gun with him. He would go around pointing his finger at people's heads pretending to pull the trigger on them." (Doc. # 56-1 at ¶ 23). In her deposition, Mrs. Pope stated that Mr. Vella told her that he had a gun, but explained that she never saw the gun: "No, I did not see the gun. He told me he kept his shirt untucked because he had a gun back here." (Doc. # 55-2 at 7).

On October 12, 2012, Mrs. Pope sent Alan Fermier – Vice President of Human Resources – an email asking that he call her that day. Mrs. Pope remembers telling Mr. Fermier "about the harassment" and submits that she told Mr. Fermier that she was "afraid." (Doc. # 48-3 at 42). However, when Mrs. Pope asked Mr. Fermier for a "plan" in the event of similar incidents, Mr. Fermier responded that he could not give her one. (Id. at 45). However, Mrs. Pope states that Mr. Fermier explained that "if anything ever happened, that [she] would call him directly, and if he didn't respond, that [she] could call [company CEO] Jeff Edwards." (Id.).

When Mrs. Pope asked Mr. Fermier if he knew that Mr. Vella "always carries a gun," Mr. Fermier responded that "he did not know this." (Doc. # 56-1 at ¶ 33). After Mrs. Pope explained that she feared Mr. Vella, Mr. Fermier allegedly

6

responded "in a very condescending tone and asked if [she] had gotten strange packages delivered or if [she] had seen any strange men lurking around [her] house." (Id. at ¶¶ 34-35).

On October 18, 2012, Mr. Pope emailed Mr. Fermier to ask that Mr. Fermier call Mr. Pope. (Doc. # 56-2 at ¶ 12). On October 22, 2012, Mr. Fermier – along with another member of HR, Jason Lawson – called the Popes to discuss the same allegations. (Id. at ¶ 13). Mrs. Pope submits that she "again told Mr. Fermier and now Mr. Lawson that [she] was terrified of Mr. Vella and that [she] felt he was a sexual predator." (Doc. # 56-1 at ¶ 41).

Thereafter, on October 29, 2012, the Popes attended a meeting with Mr. Fermier and Mr. Vella. Mrs. Pope recalls Mr. Vella shedding a tear and stating that he was sorry. (Doc. # 48-3 at 48). At this meeting, Mr. Vella commented to the Popes: "what upsets me most is that you went over my head" in reporting the conduct to HR. (Doc. # 2 at ¶ 12; Doc. # 56-1 at ¶ 48). Mrs. Pope presently alleges that Mr. Vella "made it clear that he would get back at us" for making the sexual harassment claim. (Doc. # 56-1 at ¶ 49). At deposition, however, Mrs. Pope testified: "I don't even remember what

[Mr. Vella] even said" at the October 29, 2012, meeting. (Doc. # 48-3 at 48).

Mr. Vella did not return to the Tampa office until December 10, 2012, when he was accompanied by loss prevention specialist Laura Kaiser. (Doc. # 56-1 at ¶ 51). Mrs. Pope alleges that "[a]lthough Mr. Vella spent very little of his time around me on December 10th . . . he made a point of telling me that he knew exactly where I lived and where my house was." (Id. at ¶ 53).

On December 11, 2012, Mr. Vella returned to Any Season and "called [Mr. Pope] into a separate area along with Ms. Kaiser." (Doc. # 56-2 at ¶ 28). A discussion ensued regarding Mr. Pope's failure to obtain a non-compete agreement from his son, who was a salesperson at Any Season. (Id.). That conversation culminated with Mr. Vella firing Mr. Pope. (Id. at ¶ 28). Any Season disputes that Mr. Pope was fired, but Any Season assumes Mr. Pope was terminated for purposes of the present analysis. (Doc. # 48 at 9 n.4). Thereafter, Mrs. Pope "felt compelled to resign to get herself out of the hostile situation." (Doc. # 2 at ¶ 16).

The Popes initiated this action against Any Season on March 20, 2014, in state court. (Doc. # 2). Any Season removed the case to this Court on the basis of diversity jurisdiction.

8

(Doc. # 1). The Popes' Complaint set forth the following six counts, all brought under Florida law:[2]

Count I: Sexual Harassment (Mrs. Pope)

Count II: Sex Discrimination (Mrs. Pope)

Count III: Retaliation (Mrs. Pope)

Count IV: Discrimination (Mr. Pope)

Count V: Retaliation (Mr. Pope)

Count VI: Intentional Infliction of Emotional Distress (Mr. and Mrs. Pope)

On May 14, 2015, the Court dismissed Count IV of the Complaint. (Doc. # 15). Count VI – brought against the Estate of David Vella – is also not before the Court. The Estate of David Vella was named as a Defendant, because Mr. Vella was deceased at the time the Popes filed the Complaint. (Doc. # 2 at ¶ 18). However, on July 17, 2014, the Estate was dismissed from this action without prejudice (Doc. # 25), because the Popes were "not able to discern whether there is an estate established" for Mr. Vella (Doc. # 24).

---

[2]   The Florida Civil Rights Act is patterned after Title VII. O'Loughlin v. Pinchback, 579 So. 2d 788, 791 (1st DCA 1991). "Pursuant to Florida's longstanding rule of statutory construction that recognizes that state laws patterned after federal statutes must be interpreted as if they were one, the Florida law is accorded the same construction as Title VII." Greenfield v. City of Miami Beach, Fla., 844 F. Supp. 1519, 1524 (S.D. Fla. 1992) aff'd sub nom. Greenfield v. City of Miami Beach, 20 F.3d 1174 (11th Cir. 1994).

Any Season filed the present Motion for Summary Judgment and Incorporated Memorandum of Law in Support Thereof (Doc. # 48) on February 9, 2015, which is ripe for this Court's review. This Court heard oral argument on the Motion on May 11, 2015. (Doc. # 62).

## II. <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are

no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his

conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

## III. Analysis

### A.   Count I: Sexual Harassment (Mrs. Pope)

To establish a prima facie case of sexual harassment, a plaintiff must show that: (1) she was a member of a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis to hold the employer liable. Chenault v. Ameripride Linen & Apparel Servs., 188 F. App'x 974, 975 (11th Cir. 2006). In the present matter, Any Season argues that the alleged sexual harassment was not (1) based on Mrs. Pope's sex, (2) severe or pervasive, nor (3) unwelcome. (Doc. # 48 at 11-17). Any Season further provides that the alleged harassment was promptly investigated. (Doc. # 59 at 6). Although Mrs. Pope's response focuses on whether the conduct was severe or pervasive (Doc. # 56 at 9-11), the Court will address each of Any Season's arguments in turn.

### 1.   Based on Sex

The Court first considers whether Mr. Vella's alleged harassment was based on Mrs. Pope's sex. The record demonstrates that Mr. Vella's statements regarding his own exploits were not based on Mrs. Pope's sex, because Mr. Vella told the stories to both men and women. Likewise, the "dipstick" comment was directed to a male installer. Further, as explained below, Mr. Vella's gun-related conduct is also gender-neutral.

Mrs. Pope recounts that "Mr. Vella made it very clear to myself and to others that he always carried a gun with him. He would go around pointing his finger at people's heads pretending to pull the trigger on them." (Doc. # 56-1 at ¶ 23). Although Mrs. Pope never saw Mr. Vella's gun, Mrs. Pope found these comments particularly troubling, because on December 10, 2012, Mr. Vella "made a point of telling me that he knew exactly where I lived and where my house was." (Id. at ¶ 53).

The Court understands how Mrs. Pope could have been made uncomfortable by Mr. Vella's gun-related gestures. However, Mrs. Pope herself explained that Mr. Vella "would go around pointing his finger at people's heads pretending to pull the trigger on them." (Id. at ¶ 23). Again, Mr. Vella was an "equal opportunity harasser," Holman v. Indiana, 211 F.3d

13

399, 403 (7th Cir. 2000), in that he also made those gestures to males in the office (Id.; see Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) ("[T]here may be cases in which a supervisor makes sexual overtures to workers of both sexes or where the conduct complained of is equally offensive to male and female workers. In such cases, the sexual harassment would not be based upon sex because men and women are accorded like treatment.")). There is also no indication of gender bias in Mr. Vella's exchange with Mrs. Pope regarding where she lived. In particular, Mrs. Pope described the interaction as follows:

> Q    And did you have any interaction with Mr. Vella on the 10th?
>
> A    Yes.
>
> Q    And what interaction was that?
>
> A    That was when they were in the deposition meetings [on an unrelated matter], and he sat at my desk for two hours.
>
> Q    And that's the conversation about him wanting you to buy the house that was the subject of the litigation.
>
> A    Yes. And him knowing where I lived. And wanting – then he wanted me to try to run reports that I didn't have access to.

* * *

14

> Q    And Mr. Vella never said he knew where you lived.
>       Correct?
>
> A    He – I said, "Do you know where I live?" And he
>       laughed, like, yeah.
>
> Q    But he never said yeah?
>
> A    No, he never said it.

(Doc. # 55-2 at 29-30).

Upon review, there is nothing to suggest that, but for Mrs. Pope's sex, Mr. Vella would not have engaged in this exchange. Title VII only "prohibits discrimination, including harassment that discriminates based on a protected category such as sex." Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007). Even if Mr. Vella was offensive and intimidating, if the conduct was not based upon gender, then Title VII provides no redress. See Coutu v. Martin Cnty Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII.").

In comparison to the comments discussed above, the following remarks appear to be gender-related, drawing all inferences in favor of Mrs. Pope. Specifically, Mr. Vella told Mrs. Pope that she could not "satisfy" her husband. (Doc.

# 48-3 at 28). In another interaction, Mrs. Pope suggested that the production manager, Howard Maynard, get a massage because he had been in an accident. Mr. Vella, who was also present, responded "Quit thinking about it Howard . . . I've been thinking about it for 48 hours. It's not going to happen." (Id. at 35). Finally, Mr. Vella said that he could "see [Mrs. Pope] in sales," but Mr. Vella determined that a position in sales is "not a job for a woman." (Doc. 56-1 at ¶ 21). Ultimately, Mr. Vella concluded "If you were my girl, I'd keep you right here." (Doc. # 48-3 at 32-33). Upon consideration of the substance of these comments, the Court concludes that "but for the fact of her sex, [Mrs. Pope] would not have been subject to harassment" by way of these comments. Hensen v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982). Therefore, the Court concludes that this subset of Mr. Vella's conduct was based on Mrs. Pope's gender.

## 2.   **Severe or Pervasive**

Upon consideration of the gender-related activity, the Court finds that Mr. Vella's conduct does not rise to the level of severe or pervasive necessary to support a prima facie case. Whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of

employment and create an abusive working environment," is crucial in determining whether a plaintiff has proven a hostile work environment claim. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000). A hostile work environment exists only where the work environment is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations omitted). Even if the plaintiff is able to prove one factor in the prima facie case, this "does not compensate for the absence of the other factors." Mendoza v. Borden, Inc., 195 F.3d 1238, 1248 (11th Cir. 1999) (en banc), cert. denied, 531 U.S. 1076 (2001).

To establish the threshold of severity or pervasiveness, both an objective and subjective component must be present. Mendoza, 195 F.3d at 1246. In assessing the objective component, four factors should be considered: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. Id.

For support, Mrs. Pope relies on <u>Freytes-Torres v. City of Sanford</u>, 270 F. App'x 885 (11th Cir. 2008). In that case, the Eleventh Circuit reversed the district court's grant of summary judgment in favor of defendant as to the plaintiff's harassment count where the plaintiff alleged that her supervisor's harassment:

> included daily stops by her desk to leer at her breasts; daily phone calls in which [plaintiff's supervisor] called chiefly to comment on [plaintiff's] sexy voice; asking [plaintiff] out on dates; making masturbatory gestures with [plaintiff] in the room; meeting privately with her to explain his attraction, and when rebuffed, grabbing her hand and threatening her not to tell anyone; and blocking [plaintiff] in a stairwell when she was 7-months pregnant, leaning into her body and deliberately smelling one breast.

<u>Id.</u> Mr. Vella's conduct does not rise to this level.

To begin, the entirety of Mr. Vella's harassment occurred over a two-day period, and there is no evidence that Mr. Vella's actions interfered with Mrs. Pope's employment. Specifically, the Court notes that the harassment occurred in October and Mrs. Pope did not resign from Any Season until two months later on December 11, 2012. Furthermore, although offensive, the Court does not find that Mr. Vella's alleged conduct rises to the level required by <u>Mendoza</u> and its progeny.

"Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010). Conduct far more severe or pervasive than what Mrs. Pope has alleged has failed to meet the high threshold of proof required in the Eleventh Circuit. <u>See</u> <u>e.g.</u>, <u>Lockett v. Choice Hotels Int'l, Inc.</u>, 315 F. App'x 862, 863-64 (11th Cir. 2009) (affirming summary judgment in favor of the defendant where the alleged harasser purportedly engaged in sexual banter, discussed oral sex with plaintiff, touched plaintiff's buttocks on one occasion, referred to plaintiff as a "ho" and "bitch," and "jumped in [plaintiff's] face and acted like he was going to hit [her]").

Finally, the Court acknowledges Any Season's contentions that it took prompt remedial action and that the harassment was not unwelcome. However, the Court's analysis need not reach these arguments, because Mrs. Pope has not demonstrated that the harassment was severe or pervasive. Therefore, Mrs. Pope has failed to present a prima facie case of sexual harassment. Accordingly, Any Season's Motion is granted as to Count I.

**B.** **<u>Count II: Sex Discrimination</u> (Mrs. Pope)**

"In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence, or statistical evidence." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Mrs. Pope presents no statistical evidence of discriminatory intent; the Court will evaluate the existence of direct and circumstantial evidence below.

### 1. **Direct Evidence**

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." Tippie v. Spacelabs Med., Inc., 180 F. App'x 51, 54 (11th Cir. 2006) (quoting Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla., 256 F.3d 1095, 1105 (11th Cir. 2001)).

In the instant case, Mrs. Pope argues that she "has presented direct evidence of discrimination as Mr. Vella specifically told her that her being a woman is what precluded her from a promotion to a sales position." (Doc. # 56 at 11). In particular, Mrs. Pope points to Mr. Vella's comment: "I

20

see you out of this office, I see you in sales." (Doc. # 48-
3 at 32-33). Mrs. Pope contends, however, that she was denied
the promotion to a sales position, because Mr. Vella suggested
that she would be unfaithful to her husband. (Id. at 32-33).
Mrs. Pope recalls Mr. Vella saying:

> [Y]ou have a fight with your husband. You go to a
> job site. You meet a super. He takes you to lunch.
> Then it leads to dinner and a bottle of wine. And
> then he explained how he had had affairs, numerous
> affairs, and he knows how affairs work. And that's
> when he hugged himself like this and said, "If you
> were my girl, I'd keep you right here."

(Id.). Mr. Vella told Mrs. Pope that a sales position is "not
a job for a woman." (Doc. 56-1 at ¶ 21).

The Court notes that, "[t]o amount to direct evidence,
a statement must: (1) be made by a decisionmaker; (2)
specifically relate to the challenged employment decision;
and (3) reveal blatantly discriminatory animus." Chambers v.
Walt Disney Co., 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).
"[D]irect evidence can mean nothing other than evidence from
which a trier of fact could conclude, more probably than not,
that the defendant discriminated against the plaintiff in
regard to the contested employment decision on the basis of
a protected personal characteristic." Wright v. Southland
Corp., 187 F.3d 1287, 1306 (11th Cir. 1999). At oral argument,
Any Season contended that Mr. Vella was not a decisionmaker.

However, in the Eleventh Circuit, a "decisionmaker" is broadly defined as "a person involved in the challenged decision." Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

Due to Any Season's poor financial performance and "[i]n a last effort to save the company," Mr. Vella was charged "with assessing Any Season and attempting to turn it around." (Doc. # 48-1 at ¶¶ 9-10). Mr. Fermier explained that Mr. Vella was assigned "oversight responsibilities." (Id. at ¶ 12). Mr. Vella stated that his title was Divisional President of the Southeast Region and explained: "As part of my job duties, I am responsible for regional oversight of several [Installed Building Products] branches located in the Southeast region." (Doc. # 48-4 at ¶¶ 1-2). Mr. Vella's region included Bayside, where Mr. Pope served as branch manager. (Id.). These facts support the conclusion that Mr. Vella was a decisionmaker.

The Court next examines whether Mr. Vella's comments relate to the challenged employment decision. The Eleventh Circuit has held that "'direct evidence,' in the context of employment discrimination law, means evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." Wright v. Southland

Corp., 187 F.3d 1287, 1293 (11th Cir. 1999) (emphasis added). In the present matter, Mrs. Pope cannot demonstrate – and the record does not suggest – that there is a causal link between Mr. Vella's statements and an adverse employment action.

Mrs. Pope states that Mr. Vella denied her a promotional opportunity because she is a woman. (Doc. # 56-1 at ¶ 21). In her affidavit, Mrs. Pope alleges that she responded to Mr. Vella's remarks as follows: "I told Mr. Vella that I had dealt with men all my life and that my being a female would not be an issue. Mr. Vella, however, disagreed and shut down any future conversations I attempted to have with him about my desire for the promotion." (Id. at ¶ 22). This conclusory statement is not supported in the record.

Even assuming that Mrs. Pope did attempt to address Mr. Vella's alleged discriminatory remarks, Mrs. Pope's claim fails as she cannot demonstrate an adverse employment action. Namely, there is no evidence in the record to suggest that there was a sales position open to which Mrs. Pope could have been promoted. In addition, she did not apply for a sales job. Indeed, the only evidence of a sales position in the record shows Don Alongi was hired as a salesperson, days prior to Mrs. Pope's complaint and before she even met Mr. Vella. (Doc. # 48-3 at 16-18). Therefore, Mrs. Pope has not

23

demonstrated that she suffered an adverse employment action – let alone that Mr. Vella's statements related to such action. Thus, Mrs. Pope's discrimination claim fails to the extent that it relies on direct evidence.

## 2.   Circumstantial Evidence

The Court next evaluates whether Mrs. Pope has supplied circumstantial evidence of sex discrimination. In analyzing allegations supported by circumstantial evidence under Title VII, the Court follows the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden of proof shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006).

To rebut the presumption of discrimination created by a plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. Tex. Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 254 (1981); Standard, 161 F.3d at 1331. However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at 1331. A defendant "must merely produce evidence that could allow a rational fact finder to conclude" its actions were not motivated by discriminatory animus. Id.

If the defendant produces such evidence, the burden shifts again to the plaintiff. McDonnell Douglas, 411 U.S. at 802-03. The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [her] prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

"To make out a prima facie case of [sex] discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

Any Season contends that Mrs. Pope cannot establish a prima facie case of sex discrimination, because she cannot demonstrate that she suffered an adverse employment action or that other employees were treated differently. (Doc. # 48 at 18). In response, Mrs. Pope contends that she has presented evidence that "Mr. Vella specifically told her that her being a woman is what precluded her from a promotion to a sales position." (Doc. # 56 at 11-12).

In the failure-to-promote context, the prima facie case consists of showing these elements: "(1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted." Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010).

Any Season contends that there is no evidence in the record to demonstrate that there was an open sales position available. (Doc. # 59 at 6-7); see Duffy v. Lowe's Home Centers, Inc., 414 F. Supp. 2d 1133, 1143 (M.D. Fla. 2006) (plaintiff cannot establish a prima facie case if an open position does not exist); Crawford v. Johnson, 133 F. App'x 674, 675 (11th Cir. 2005) (employer entitled to summary

judgment because plaintiff could not have been promoted to a position that did not exist). Any Season alleges that the only evidence of a sales position in the record shows Mr. Alongi was hired as a salesperson, days prior to Mrs. Pope's complaint and before she even met Mr. Vella. (Doc. # 48-3 at 16-18).

Even assuming there was a sales opening, Any Season argues that there is similarly no evidence in the record to suggest that Mrs. Pope was qualified for a position in sales. (Doc. # 59 at 5-6). During her deposition, Mrs. Pope explained that she had "done sales before" when she "sold photography in Indiana." (Doc. # 48-3 at 32). In order to be qualified for a promotion, Mrs. Pope must demonstrate that "she satisfied an employer's objective qualifications." Kidd v. Mando American Corp., 731 F.3d 1196, 1204 (11th Cir. 2013) (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). Although Any Season's objective qualifications are not before the Court, the record contains evidence upon which a reasonable juror could rely to find that Mrs. Pope would be qualified to serve as a salesperson. In addition to her previous experience in sales, Mrs. Pope spent approximately 8 years in the installation industry. (Doc. # 48-3 at 4-5).

Despite Mrs. Pope's qualifications, however, the record does not suggest that Mrs. Pope applied for a position in sales. More importantly, there is also no evidence in the record to demonstrate "that other equally or less-qualified employees outside her class were promoted" or that Any Season otherwise treated male employees more favorably. Brown, 597 F.3d at 1174. Mrs. Pope has not established a prima facie case of sex discrimination based on circumstantial evidence. Therefore, Mrs. Pope's claim of sex discrimination fails and, thus, Any Season's Motion is granted as to Count II.

C.   **Counts III and V: Retaliation** (Mrs. Pope and Mr. Pope)

"Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)). "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an

adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation omitted).

When a plaintiff-employee establishes a prima facie case of retaliation, the burden shifts to the defendant-employer to present evidence of a legitimate, non-discriminatory reason for the challenged employment action. Connor, 546 F. Supp. 2d at 1372. The employer's burden is "exceedingly light" Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994), and "easily fulfilled" Howard v. BP Oil Co., Inc., 32 F.3d 520, 524 (11th Cir. 1994). The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55. Rather, as long as the employer "articulates a clear and reasonably specific non-discriminatory basis for its actions," it has met its burden of production. Vessels, 408 F.3d at 770 (per curium) (internal quotation marks omitted).

### 1.   <u>Count III: Mrs. Pope's Retaliation Claim</u>

As to Mrs. Pope's retaliation claim, the Court finds that Mrs. Pope is unable to demonstrate an adverse employment action. Namely, the record demonstrates that Mrs. Pope resigned from her employment with Any Season. In her affidavit, Mrs. Pope states: "As I was so thoroughly retired (sic) of working with Mr. Vella in the office without my husband there for protection, I felt compelled to resign." (Doc. # 56-1 at ¶ 57). To the extent that she argues that she was constructively discharged, Mrs. Pope must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." <u>Menzie v. Ann Taylor Retail Inc.</u>, 549 F. App'x 891, 894-95 (11th Cir. 2013) (quoting <u>Poole v. Country Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th Cir. 1997)). The Eleventh Circuit has noted that "this objective standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment." <u>Id.</u>  The threshold "is quite high." <u>Beltrami v. Special Counsel, Inc.</u>, 170 F. App'x 61, 62-63 (11th Cir. 2006) (collecting constructive discharge cases).

As the Court concluded above, Mrs. Pope has not demonstrated the requisite frequency or severity to sustain a hostile work environment claim – let alone a claim of constructive discharge. Furthermore, the Court notes that Mrs. Pope resigned immediately after Mr. Pope's firing. Therefore, Mrs. Pope did not provide Any Season a chance to address her concerns regarding working in the office with Mr. Vella without Mr. Pope being present. "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (emphasis in original). Because Mrs. Pope has failed to set forth a prima facie case of retaliation, Any Season's Motion is granted as to Count III.

### 2.   Count V: Mr. Pope's Retaliation Claim

As to Mr. Pope's retaliation claim, Any Season disputes Mr. Pope's claim that he was fired. (Doc. # 48 at 9 n.4). "However, for purposes of this motion only, Any Season will assume Mr. Pope was terminated for failing to obtain Jim Jr.'s signature on the non-compete agreement." (Id.). Assuming arguendo that Mr. Pope has set forth a prima case of retaliation, the burden shifts to Any Season to present evidence of a legitimate, non-discriminatory reason for the

31

challenged employment action. <u>Connor</u>, 546 F. Supp. 2d at 1372.
In the present matter, Any Season submits that Mr. Pope was
terminated for his failure to secure a non-compete agreement
from his son, who was the only salesperson at Any Season
without a non-compete agreement. (Doc. # 48-1 at ¶ 23).

Mr. Vella states in his affidavit that he "sought to
enforce [the company's] policy that all salespersons sign
non[-]compete agreements." (Doc. # 48-4 at ¶ 11). In
furtherance of that goal, on November 28, 2012, Mr. Vella
emailed Mr. Pope a non-compete agreement to have Mr. Pope's
son execute. (Doc. # 48-1). At one point in the conversation,
on November 29, 2015, Mr. Vella remarked: "[Jim Jr.] should
[have] had it before he ever received a paycheck which would
fall right back on you." (<u>Id.</u>). In his affidavit, Mr. Vella
stated that the last time he confronted Mr. Pope regarding
the issue with the non-compete agreement was on December 11,
2012. (Doc. # 48-4 at ¶ 12). Mr. Vella explained:

> In Bayside's warehouse, I again asked [Mr. Pope]
> why a non-compete agreement has not been secured
> from Jim Pope, Jr. . . . Once again, [Mr. Pope]
> refused to cooperate, and I explained that if Jim
> Pope, Jr. did not sign the non-compete agreement
> then Jim Pope, Jr. would no longer be able to work
> for Bayside given the company policy to have non-
> compete agreements from salespersons.

32

(Id.). Assuming that Mr. Pope was fired, Any Season has supplied a legitimate, non-discriminatory reason for his termination. Again, the Court notes that the employer's burden is "exceedingly light" Meeks, 15 F.3d at 1021, and "easily fulfilled" Howard, 32 F.3d at 524.

If the defendant offers legitimate, non-discriminatory reasons, the plaintiff must respond by showing that the employer's reasons are a pretext for retaliation. Tucker v. Talladega City Sch., 171 F. App'x 289, 296 (11th Cir. 2006). However, the Court notes that:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).

Mr. Pope cannot show that Any Season's justification for the termination is pretext for retaliation. "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how . . . mistaken the firm's managers, [the Court] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." Id. (internal quotations and

33

citations omitted). Thus, Mr. Pope's retaliation claim fails and Any Season's Motion is granted as to Count V.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Any Season Insulation, LLC d/b/a Bayside Installed Building Products' Motion for Summary Judgment and Incorporated Memorandum of Law in Support Thereof (Doc. # 48) is **GRANTED**.

(2)   The Clerk is directed to enter judgment in favor of Defendant, terminate all pending deadlines and motions, and, thereafter **CLOSE THIS CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 26th day of May, 2015.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:  All Counsel and Parties of Record

34